UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No.: 21-cr-2 (CJN) |
| : | |
| MOHAMMAD EZAZUL HOQUE, : | |
| : | |
| Defendant. : | |

### UNITED STATES' SENTENCING MEMORANDUM

The Defendant, Mohammad Ezazul Hoque, admitted and pled guilty to extensive schemes aimed at lining his own pockets through corruption and fraud. His crimes reflect an assault on the integrity of government institutions and a callous disregard for his victims. The nature of the Defendant's conduct, and the fact that some of it post-dated his criminal conviction in another fraud case in the state district court of Virginia, warrant a sentence within the Guidelines range, a fine, and a period of supervised release of three years.

**I.     The Defendant's Criminal Conduct**

Since at least 2017, the Defendant has corrupted the District of Columbia tax system, defrauded the District of taxes it was owed, stolen his friends' and associates' identities, defrauded financial institutions, and attempted to defraud the federal government of funds intended to assist those suffering financial hardship because of the ongoing COVID-19 pandemic.

**A.     The Defendant's Crimes to Avoid Significant Tax Obligations**

The Defendant has owned several businesses in the District of Columbia and, over the years, has accumulated significant tax debts related to all of them. ECF No. 19, ¶¶ 1-7. Instead of paying these tax debts or accepting the consequences of not doing so, the Defendant resorted to crime so that he could continue to operate his business without paying what was owed. First, he chose bribery to avoid his debts. From 2015 through 2018, the Defendant paid more than $45,000

in bribes to Public Official 1, the Chief of the Collections Division at the District of Columbia Office of Tax and Revenue ("OTR"), in exchange for Public Official 1 using his position to stop OTR from taking adverse action against the Defendant and his businesses and to help the Defendant avoid having his large tax bills finally come due. *Id*. ¶¶ 9-15. First, the Defendant paid the bribes through an intermediary, Person 1, and then to Public Official 1 directly. *Id*.

As a direct result of his bribery, the Defendant was able to profit on at least one of his businesses, 14th Street Eatery, a business in relation to which, by April 2015, he owed more than $155,000 in taxes and related interest and penalties to the District. *Id*. ¶ 7. By May 2016, the Defendant wanted to sell the business, but needed a Certificate of Clean Hands from OTR—a document certifying that the business had no outstanding tax liabilities. In exchange for bribes, Public Official 1 not only provided the certification, but also instructed a subordinate to release an outstanding $39,000 lien on the business that had been in place for almost three years, unpaid. *Id*. ¶¶ 10-11. With the Clean Hands certificate in hand and the removal of the lien, the Defendant was able to sell the business at a profit to himself of at least $84,000. *Id*. ¶ 12.

Bribery is not the only criminal means by which the Defendant has attempted to avoid paying the taxes he owes to the District. Between 2017 and 2019, the Defendant also submitted fake death certificates which he—in the name of himself or his wife—used to claim that an owner of one of the several businesses he controlled had died and therefore could not be held liable for the tax debt. *Id*. ¶ 16; *see also, e.g.*, Ex. 1 (letter in name of Defendant's wife claiming holder of tax debt for U Street Subway, one of the Defendant's entities, had died and seeking forgiveness of tax bill of over $17,000).[1]

---

[1] The Defendant submitted multiple letters and fake death certificates over the years. The

2

### B. The Defendant's Credit Card Fraud Scheme

In addition to seeking to avoid his expenses, the Defendant also engaged in a prolonged scheme to open credit cards and other lines of credit in the names of his friends and associates and accumulate debt without consent. Between 2013 and 2017, the Defendant opened more than 15 credit cards in the names of multiple individuals to fund his personal and business expenses. ECF No. 19 ¶¶ 17-20. One of his victims informed the Government that he provided the defendant with his personal identifying information with the understanding that the Defendant needed it to provide medical services to the victim. Instead, the victim later discovered the Defendant had opened credit cards and loan accounts in the victim's name. Exhibit 2 at 2 (interview report of victim); *see also* Exhibit 3 at 2 (interview report of second victim regarding the Defendant's identity theft and fraud).

While the Defendant sometimes made payments on the cards he used, he has admitted that he often did not. *Id*. ¶¶ 21-22. Indeed, in a text message exchange with one of his victims in approximately December 2019, the victim complains to the Defendant that he has left $20,000 in charges on a credit card in her mother's name and asks the Defendant why he ruined her mother's credit. Exhibit 4 at 8-10 (text messages with victim; rows 41-53). In the messages, the victim goes on to tell the Defendant that her mother has to pay more each month on her "cheap car" because of it and asks the Defendant to "stop this plz [sic]."[2]  *Id*. at 8 (row 43).

---

Government provides just one example here.

[2] In the same text exchange, the victim references the fact that a balance of $49,000 remains outstanding on another credit account. Ex. 4 at 24-27. When interviewed about these exchanges by the Government in February 2021, after the Defendant pled guilty, the victim claimed that she and her mother had allowed the Defendant to open accounts in their names. The victim, however, maintains a close relationship with the Defendant and admitted during the interview that she had

### C.  The Defendant's Attempt to Defraud a COVID-19 Relief Program

Finally, in the COVID-19 pandemic, while others saw financial hardship, the Defendant saw financial opportunity.  To help small businesses weather the pandemic, Congress, as part of the Coronavirus Aid, Relief, and Economic Security Act, authorized the Small Business Administration ("SBA") to use an emergency relief loan program, called the Economic Injury Disaster Loan ("EIDL") program, to provide funds to small businesses experiencing financial disruption.  To be eligible for a loan, a small business had to submit various information about its operations, such as the number of employees and the gross revenues it had received in the prior year.  The amount of an EIDL a business received depended on the information it provided, although businesses could receive an advance of up to $10,000 based on the number of employees reported.

In June 2020, the Defendant submitted an application for an EIDL for a business he did not own and for which he was not authorized to seek an EIDL.  ECF No. 19, ¶ 29; Ex. 5 (fraudulent EIDL application).  In the application, the Defendant falsely asserted that he was the owner of the business and claimed he had four employees.  *Id*.  He also provided a bank account he controlled as the account to which the SBA should send funds.  *Id*.  The SBA detected the Defendant's fraud before it issued funds and thus avoided any loss.  ECF No. 19 ¶ 30.

## II.  The Defendant's Conduct Warrants a Guidelines Sentence of Incarceration

To determine an appropriate sentence, the Court must first accurately calculate the

---

talked to the Defendant about the fact that the Government wanted to interview her before the interview—although she did not disclose details of what she and the Defendant discussed. Moreover, in the messages in Exhibit 4, the victim instructs the Defendant to take one line of credit out of her name, Ex. 4 at 3-5 (rows 16-25), suggesting her February 2021 claims to the Government of giving permission to the Defendant were false.

Defendant's advisory Guidelines range, and then consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). "In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." To make this determination, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence without regard to the rules of admissibility at trial. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a)). The Court's findings of fact at sentencing are subject to clear error review. *United States v. Bikundi*, 926 F.3d 761, 796 (D.C. Cir. 2019).

### A. The Guidelines Calculation

The Defendant pled guilty to one count of bribery, in violation of 18 U.S.C. § 201, and one count of wire fraud, in violation of 18 U.S.C. § 1343. Pursuant to the plea agreement in this matter, the parties have stipulated that the following Guidelines apply:

Count One of the Information:

| Citation | Description | Level |
|---|---|---|
| U.S.S.G. § 2C1.1(a)(2) | Base Offense Level | 12 |
| U.S.S.G. § 2C1.1(b)(1) | More than one bribe | 2 |
| U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(D) | Benefit to be received greater than $40,000 | 6 |
| U.S.S.G. § 2C1.1(b)(3) | Bribery of high-level decisionmaker | 4 |
| | Total | 24 |

Count Two of the Information:

| Citation | Description | Level |
|---|---|---|
| U.S.S.G. § 2B1.1(a) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(D) | Loss greater than $40,000 | 6 |
| U.S.S.G. § 2B1.1(b)(11) | Unlawful use of another's identification | 2 |
| | Total | 15 |

The parties also stipulated that the two offenses to which the Defendant pled guilty do not group pursuant to Section 3D1.2 of the Sentencing Guidelines. Under the Guidelines, the combined offense level under these circumstances is determined by taking the highest offense level and increasing it as required under Section 3D1.4. Because the offense level for Count Two is 9 or more levels lower than that for Count One, however, no additional increase in offense level is applied to Count One. Accordingly, the total combined offense level is 24.

In the plea agreement, the Government agreed that the Defendant should receive a two-point reduction for acceptance of responsibility. The Government also believes that the Defendant should receive an additional one-point reduction under the Guidelines for providing the Court and the Government with timely notice prior to indictment of his intention to enter a guilty plea. Under the Guidelines, therefore, the applicable offense level, as stipulated by the parties is 21.

The Government has no reason to dispute U.S. Probation's calculation that the Defendant's criminal history category score is I. Accordingly, with an offense level of 21 and criminal history category of I, the recommended Guidelines sentence is 37 to 46 months.

### B. Section 3553(a) Factors

Under Section 3553(a), the Court must consider several factors to determine the appropriate sentence, including the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence, as well as to protect the public from future crimes of the Defendant. 18 U.S.C. § 3553(a). Here, the Defendant's criminal history, the pattern of fraudulent and corrupt conduct at issue in this case, the impact of his identity theft schemes on his

6

victims, the need to avoid disparate sentences, and the need for deterrence and to protect the public warrants a sentence of incarceration within the Guidelines range, a substantial fine, and a three-year period of supervised release.

            i.        *The Defendant's criminal conduct was serious and wide-ranging.*

The Defendant's conduct was egregious, spanned many years, and caused extensive harms to many different entities and people.

First, the Defendant engaged in a bribery scheme to enrich himself at the expense of the District of Columbia government and taxpayers. He not only harmed a public institution, but he degraded public trust in that institution by bribing one of its high-ranking officials. And his bribery scheme was not short-lived. He paid Public Official 1 over the course of several years, and recognized his conduct was wrong and criminal, but kept doing it anyway. At one point in February 2016, still early in the bribery scheme, he told Person 1—his initial intermediary to Public Official 1—by text message that, "I will be always careful to save you. . . . Bc [sic] if you go to jail then I will go to jail I know that ::)." ECF No. 1 ¶ 24(a). Nevertheless, the Defendant continued to pay Public Official 1 for two more years, intending that Public Official 1 continue to help him avoid paying taxes. In addition, he engaged in his bribery scheme not simply to buy himself a little more time to make ends meet and pay his bills—he did it because he never wanted to pay his bills in the first place. Indeed, after the Defendant made a $15,000 payment to OTR on one occasion, he later texted his intermediary and asked if he, Person 1, and Public Official 1 could split the funds. *Id* ¶ 24(i). Even after his relationship with Public Official 1 fizzled in 2018, the Defendant still continued to try to avoid his tax debts by falsely claiming he or other purported owners of the businesses had died.

Not only did the Defendant harm and defraud OTR and the citizens of the District of Columbia by corrupting one of its officials, but he also manipulated and used those close to him to obtain their personal identifying information to acquire credit cards and other lines of credit in their names for his personal use. *E.g.*, Ex. 2 at 2; Ex. 3 at 2. By doing so, he stole from the financial institutions from which he obtained credit he never repaid, and he inflicted collateral harm on his victims. As one victim pointed out to him, as discussed above, his conduct harmed victims' credit. As the Defendant was able to live life on other people's dimes, his victims have to spend life dealing with all the obstacles to financial health that bad credit and large debts outstanding in one's name can inflict. Moreover, the Defendant now claims he did pay the lines of credit back as required and that his victims are actually his beneficiaries, PSR ¶ 39a—this is not only belied by the evidence and his own admissions in his plea colloquy, but it demonstrates his lack of care about the harm he inflicts on others in his efforts to amass wealth for himself. The Defendant's credit and identity theft fraud carried significant consequences for those whose identities he used. The sentence in this case must reflect the seriousness of those harms.

Finally, and perhaps most egregiously, at the height of the pandemic's financial uncertainty—in mid-2020—when businesses were suffering and people were losing their livelihoods, the Defendant falsely claimed to own a business in need of help and sought COVID-19 relief funds. Luckily, his scheme failed before the government provided him funds, but the fact that he made false representations and wasted government loan review resources at a time when so many were trying to get through for assistance cannot be ignored.

The breadth of the Defendant's conduct and the collective harms he caused through his schemes warrant a sentence of incarceration within the Guidelines range.

8

     *ii.*  *The need to avoid disparate sentences requires a sentence within the Guidelines range.*

  The Defendant is not the only individual to be sentenced recently in this District for paying bribes to OTR officials, and the Government submits that his sentence should be considered in the context of the sentence imposed in the other case. Specifically, Bobby Tucker pled guilty to one count of bribery, in violation of 18 U.S.C. § 201, and was sentenced on December 3, 2020, to 14 months of imprisonment. *United States v. Bobby Tucker*, No. 19-cr-165 (D.D.C.) (Howell, J.). Tucker was sentenced for paying $5,000 in bribes to an OTR official over the course of several months in exchange for the official reducing a tax debt for one of Tucker's clients by approximately $150,000. *See id.*, ECF No. 1 (Indictment). Here, the Defendant paid bribes of more than $45,000 over the course of several years. Moreover, he paid them in an attempt to avoid tax liabilities faced by multiple businesses, just one of which faced a debt of more than $155,000 at one point in 2015, shortly before the Defendant began paying bribes. The Defendant's bribery scheme, therefore, was significantly longer in time and sought more official acts with more bribes. In addition, the Defendant did not just engage in a single bribery scheme. Over the course of years, he has executed multiple fraud schemes too. To avoid sentencing disparities, a more significant sentence is required in the Defendant's case than that imposed on Tucker.[3] A sentence within the Guidelines range appropriately reflects the more expansive and harmful nature of the Defendant's conduct.

---

[3] The Government notes that, while Tucker did not plead guilty pursuant to a plea agreement or debrief with the Government, the Defendant did. The Defendant debriefed with the Government twice, demonstrating a willingness to cooperate. Ultimately, the Government was unable to further any other investigation based on what the Defendant provided.

     iii. *The Defendant's conduct establishes a significant need for deterrence and to protect the public from further harm.*

  There is a substantial need for deterrence and to protect the public in this case. The Defendant has shown that a criminal conviction will not deter him. On January 24, 2018, he was sentenced for identity theft in the state court in Virginia to a 12-month suspended sentence. PSR ¶ 71. Despite having a criminal fraud conviction, the Defendant continued to engage in additional frauds—it was after that sentencing date that the Defendant submitted some of his fraudulent death certificates to OTR and submitted a fraudulent application to the SBA for an EIDL.

  Moreover, one of the motives for the Defendant's criminal conduct still exists—millions of dollars in outstanding tax debts. *See* PSR ¶ 115. And the Defendant has not shown that he takes his responsibility to pay them off any more seriously than he did when he decided to engage in bribery and fraud to instead avoid them outright. According to information obtained from OTR, while the Defendant's told OTR in September 2020, shortly after he was first approached by the Government in this case, that he wanted to pay off his debts, he has not responded to additional efforts by OTR to put him on a payment plan or provided records OTR requires to determine his eligibility for one. *See, e.g.*, Ex 6 (case file notes for Minnesota Ave. Subway, one of the businesses for which the Defendant owes taxes).[4] Accordingly, it appears that the circumstances under which the Defendant resorted to fraud and corruption have not changed. Coupled with the fact that he was not deterred by a criminal conviction before and he now is minimizing his prior crimes by trying to deny loss, PSR ¶ 39a, only a sentence of incarceration

---

[4] OTR has provided similar records for several other businesses, which the Government can provide the Court if necessary.

will be sufficient to deter the Defendant and protect the District in the future.

Finally, based on the Government's review of the Defendant's disclosures to U.S. Probation, it appears the Defendant has received income he has not reported to the U.S. Government that comes from unexplained sources. For example, according to records obtained from Citibank, in early 2019, the Defendant received over $200,000 from an entity purportedly based in Hong Kong called Voice Cloud Technologies, which purports to provide voice over IP services.[5] Ex. 7 (summarizing transfers from Voice Cloud Technologies into accounts controlled by the Defendant). Yet, it does not appear the Defendant reported this income on his federal taxes. PSR ¶ 118b. Moreover, the Government has previously asked the Defendant to explain these transfers, among others from foreign entities. Although the Defendant claimed they were the result of property sales in Bangladesh, the Defendant has never provided information sufficient to corroborate his claim.

### III.    Restitution and Forfeiture

Although the provisions of the Mandatory Victim Restitution Act apply in this case, the parties have not stipulated to a restitution amount and the Government is not able to identify needed restitution based on the information it has gathered, in part because the Defendant has not provided records or information that would allow a calculation of restitution or that identifies victim-financial institutions to which it might be owed.

As part of his plea agreement, the Defendant agreed to the imposition of a forfeiture money judgment of $84,000, the minimum amount of profit he realized from his bribery scheme with

---

[5] *See* http://www.voicecloudtech.com/q/news/en/p/index/index.html?qd_guid=cUmcYWblOS (last visited on Jan. 4, 2022).

Public Official 1. The Government has provided a draft proposed consent order to counsel for the Defendant and is awaiting his and his client's approval to file it with the Court. The Government anticipates filing the proposed order before sentencing on January 11, 2022, so that the forfeiture order can be made part of the judgment in this case.

**IV.     Conclusion**

The Defendant engaged in multiple schemes across many years that undermined government functions, defrauded individuals who trusted him, and attempted to take advantage of a moment of national crisis for his own gain. His conduct and the harms he inflicted, as well as the evidence that he will not easily change course, warrant a sentence of incarceration within the Guidelines range of 37 to 46 months, a substantial fine, and supervised release for three years.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     /s/ Amanda R. Vaughn
Amanda R. Vaughn
Assistant United States Attorney
MD Bar (no numbers assigned)
555 4th Street, N.W.
Washington, D.C. 20530
202-252-1793
amanda.vaughn@usdoj.gov